**No. 21-17138**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

**STEPHANIE SHARP; et al.,**

*Plaintiffs-Appellants*,

**v.**

**S&S ACTIVEWEAR, L.L.C.,**

*Defendant-Appellee,*

_____

On Appeal from the United States District Court
For the District of Nevada
Case No. 3:20-cv-00654-MMD-CLB
The Honorable Miranda Du

_____

**APPELLANTS' OPENING BRIEF**
_____

Mark Mausert
Sean McDowell
729 Evans, Ave.,
Reno, NV 89512
Telephone: (775) 786-5477
Facsimile: (775) 786-9658

*Attorneys for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

**Page:**

CORPORATE DISCLOSURE STATEMENT……………………………………….ii

TABLE OF AUTHORITIES………………………………………….…..iii-vi

JURISDICTIONAL STATEMENT……………………………….…..………1-2

STATEMENT OF ISSUES……………………………………………….......2

PERTINENT LEGAL PROVISIONS…………………………………………..2

STANDARD OF REVIEW…………..……………………………………….3

STATEMENT OF THE CASE…………………………………………..3-4

STATEMENT OF THE FACTS…………………………………………..4-33

ARGUMENT……………………………………………………...7-33

       1.  EXTREMELY OFFENSIVE SEXUAL CONDUCT………....7-16

       2.  THE DISTRICT COURT DID NOT FACTOR THE DIFFERENT MANNER IN WHICH MEN AND WOMEN WERE OFFENDED………………………………………………16-27

       3.  THE DISTRICT COURT'S ANALYSIS IS WRONG..…….27-31

       4.  THE COURT'S ANALYSIS IS UNWORKABLE………….31-33

CONCLUSION……………………………………………………33-34

STATEMENT OF RELATED CASES……………………………………..34

CERTIFICATE OF COMPLIANCE…………………………………...…...35

CERTIFICATE OF SERVICE…………………………………………………36

i

## CORPORATE DISCLOSURE STATEMENT

The Appellee, S&S Activewear, is a limited liability corporation.

# TABLE OF AUTHORITIES                                    Page:

## Cases

*Beckington v. Am. Airlines, Inc.*
    926 F.3d 595, 604 (9th Cir. 2019)……………………………….……….3

*Bell v. Clackamas County*
    341 F.3d 858 (9th Cir. 2003)………………………………….…………22

*Bostock v. Clayton County, Georgia*
    590 U.S. ___, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020)………………26, 29

*Burlington N. & S. F. R. Co. v. White*
    548 U.S. 53, 59 (2006)……………………………………………………..26

*Campbell v. Haw. Dep't of Ed.*
    892 F.3d 1005, 1017 (9th Cir. 2018)……………………..………………23

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*
    590 F.3d 806, 912 (9th Cir. 2010)……………………………...……..3

*Ellison v. Brady*
    924 F.2d 872 (9th Cir. 1991)……….10, 13, 15, 19, 20, 23, 24, 27, 28, 29, 34

*Equal Employment Opportunity Commission v. National Education Association*
    422 F.3d 840 (9th Cir. 2005)…………………………………...………30

*Fitzgerald v. Barstable Sch. Comm.*
    555 U.S. 246, 249, 129 S. Ct. 788, 172 L.Ed.2d 582 (2009)…………….…3

*Griggs v. Duke Power Co.*
    401 U.S. 424, 432, 91 S. Ct. 849, 854, 28 L.Ed.2d 158 (1971)…………….28

*Harris v. Forklift Sys., Inc.*
    510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)…………....…11, 21, 25

*Henson v. Dundee*
    682 F.2d 897, 902 (9th Cir. 1991)……………………………………..27

*King v. Board of Regents*
    898 F.2d at 537……………………………………….……………19

*Little v. Windermere Relocation, Inc.*
    301 F.3d 958, 966 (9th Cir. 2001)…………………………………….10

*Los Angeles v. Dept. of Water and Power v. Manhart*
    435 U.S. 702, 707, n.13 (1978)……………………………………….8

*McGinest v. GTE Service Corp.*
    360 F.3d 1104 (9th Cir. 2004)…………………………………..10, 21, 24

*Meritor Savings Bank v. Vinson*
    477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)………...…7, 8, 9, 23, 31

*Neitzke v. Williams*
    490 U.S. 319, 326-27, 109 S. Ct. 1827, 104 L.Ed.2d 338 (1989)………….3

*Nelson v. City of Irvine*
    143 F.3d 1196, 1200 (9th Cir. 1998)………………………….…………3

*Oncale v. Sundowner Offshore Services, Inc.*
    532 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)….7, 11, 22, 23, 28, 30

*Parento v. Washoe County*
    (Case No. 3:19-cv-00303-MMD-WGC)(D. Nev. Feb. 18, 2021)……...…24

*Pasadena Republican Club v. W. Justice Ctr.*
    985 F.3d 1161, 1166 (9th Cir. 2021)………………………………..3

*Robinson v. Jacksonville Shipyards*
    760 F. Supp. 1486, 1506 (M.D. Fla. 1991)……………………………25, 30

*Rodgers v. Western-Southern Life Ins. Co.*
    12 F.3d 668, 675 (7th Cir. 1993)…………………………………...…21

*Rogers v. EEOC*
    454 F.2d, 234, 238 (5th Cir. 1971)…………………………..………..8, 28

*Sprogis v. United Air Lines, Inc.*
    444 F.2d 1194, 1198 (7th Cir. 1971)…………………………………......8

*Steiner v. Showboat Operating Company*
    25 F.3d 1459 (9th Cir. 1994)…………………………..…………10, 21, 22

*Watson v. Fort Worth Bank & Trust*
    487 U.S. 977, 986 (1988)……………………..…………………………26

*Wyerick v. Bayou Steel Corp.*
    887 F.2d 1271 (5th Cir. 1989)……………………………...………..31

## Statutes/Regulations

28 U.S.C. sec. 1291……………………………………………………….2

28 U.S.C. 1343……………………………………………...…………...2

42 U.S.C. 2000e, et seq……………………………………..……2, 11

29 C.F.R. sec. 1604.11(a)…………………………………………...12

## Rules

FRCP 54(b)…………………………………………………...………...4

FRCP 12…………………………………………………..…..12, 22, 34

Ninth Circuit Rule 28-2.6………………………………...………..34

## Other Authorities

Code of Federal Regulations………………………………..…..11

Two Minds: The cognitive differences between men and women by Bruce Goldman, published in Stanford Medicine, Spring 2017………………….14

*The Aftermath of Meritor: A Search for Standards in the Law of Sexual Harassment*, 98 Yale L.J. 1717, 1737-38 (1989)………………………..31

EEOC Compliance Manual (CCH) sec. 615, 3112, C at 3242 (1988)…………..19

## JURISDICTIONAL STATEMENT

Appellants appeal the United States District Court's Order partially granting S & S Activewear, L.L.C.'s (hereinafter "S & S") Motion to Dismiss. This appeal is directed at the dismissal of appellants' hostile work environment cause of action, i.e., the cause of action which sounds in exposure to "rap" or "hip-hop" music.

The District Court entered an Order on December 8, 2021, which partially adjudicated this case, i.e., the most important cause of action was dismissed (appellants could have litigated the conduct ancillary to the rap music but chose to appeal instead). Rather than proceed to trial, and then appeal, plaintiffs/appellants filed a motion, which was unopposed, for leave to appeal. That motion was filed so as to avoid piecemeal litigation, i.e., subsequent litigation in the event plaintiffs prevail upon their legal theories. On December 27, 2021, the District Court issued an Order which granted the motion, directed entry of partial final judgment, and stayed the case.

The Court's December 27, 2021, Order reads in part:

> Certification to appeal is appropriate because Plaintiffs' sexual harassment claim, as it relates to the playing of rap music which offended both male and female employees, is a final order of this Court that is sufficiently factually dissimilar from other potential remaining claims. Moreover, appellate review of this Court's decision may be useful in guiding the remaining claims. If Plaintiffs seek to pursue a similar theory of hostile work environment, in which men and women assert claims for the same conduct, the Court's holding that such action is not discriminatory as a matter of law would curtail those claims. If Plaintiffs do not, then the issues involved in the hostile work environment claim are sufficiently separate and may proceed independently from Plaintiffs['] other claims. Accordingly, the Court will grant Plaintiffs' Motion.

*See* Order, p.3, *Stephanie Sharp, et al., v. S&S Activewear, LLC.,* No. 3:20-cv-

00654-MMD-CLB (D. Nev. 2021); (ER-6).

The Court directed the Clerk to enter partial final judgment in favor of S & S; granted Rule 54(b) certification and stayed the action until this appeal is resolved. Two days after partial final judgment was entered, i.e., on December 29, 2021, appellants filed a Notice of Appeal.

28 U.S.C. sec. 1291 grants the Courts of Appeal jurisdiction to review all final decisions, both civil and criminal. The District Court had jurisdiction pursuant to 28 U.S.C. 1343 and 42 U.S.C. 2000e, et seq. The District Court had jurisdiction because appellants are members of protected classes, i.e., they are women, and a man, who allege they were subject to a work environment, rendered hostile "because of sex". At all relevant times appellee employed at least fifteen persons for at least twenty weeks per year.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Is the application of Title VII defeated because both men and women are offended by sexual misconduct?

Did the District Court over-simplify, and thereby ignore the reality that particular rap music songs are possessed of the ability to sexually offend men and women in different ways?

Would refusing to enforce Title VII, based on the proposition because women and men are offended, frustrate Congressional intent, and cause an absurd result?

## PERTINENT LEGAL PROVISIONS

The primary statute, pertinent to this case is Title VII of the 1964 Civil Rights Act, i.e., 42 U.S.C. 2000e, et seq.

The applicable Rule of civil procedure is Federal Rule of Civil Procedure 12.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a grant of dismissal in a Title VII case. Dismissal is proper if a complaint does not state a cognizable legal theory. (*Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 604 (9th Cir. 2019); *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)). When adjudicating a Rule 12(b)(6) dismissal, the Court presumes all well-pleaded allegations are true, resolves all reasonable doubts and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party. (*Fitzgerald v. Barstable Sch. Comm.*, 555 U.S. 246, 249, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009)). A judgment on the pleadings is valid when "taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." (*Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)).

In *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1166 (9th Cir. 2021), the Court wrote:

> We review *de novo* a district court's decision to grant a motion to dismiss. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads the factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted).

## <u>STATEMENT OF THE CASE</u>

S & S filed a Motion to Dismiss in April, 2021. Appellants opposed that Motion.

On December 8, 2021, the Court entered an Order which dismissed the

primary claim of plaintiffs, i.e., the cause of action re a sexually hostile work environment based primarily upon offensive "rap" or "hip-hop" music. The Court wrote in part:

> It is therefore ordered that Defendant's motion to dismiss (ECF No. 9) is granted in part and denied in part, as stated herein. Plaintiffs' sexual harassment claim with respect to the music played in the warehouse is dismissed with prejudice and without leave to amend. However, Plaintiffs may amend their complaint to assert other bases of sexual harassment that support a sexual harassment claim. Any amended complaint must either remove references to a collective action or state a claim under the FLSA.

*See* Order, p. 10. *Stephanie Sharp, et al., v. S&S Activewear, LLC.,* No. 3:20-cv-00654-MMD-CLB (D. Nev. 2021); (ER-22).

Instead of filing a second amended complaint, plaintiffs obtained leave and filed this appeal. On December 27, 2021, the District Court directed the Clerk to enter partial final judgment in favor of S & S, which the Clerk did on December 27, 2021. That Judgment was, in fact, entered on December 27, 2021. The Court also granted Rule 54(b) certification – thereby allowing an immediate appeal. The Court stayed the case re the surviving causes of action pending outcome of this appeal. On December 29, 2021, appellants filed a Notice of Appeal.

## STATEMENT OF FACTS

Seven women and one man, former employees and employees of S & S Activewear, L.L.C., filed a Complaint and Jury Demand in United States District Court, in Reno, Nevada, on November 23, 2020. In February of 2021,

plaintiffs/appellants filed a First Amended Complaint (FAC); (ER-83-96). Appellants considered seeking class active certification, but his appeal does not concern that aspect.

Appellants alleged they exhausted their administrative remedies and were in receipt of Notices of Right to Sue, issued by the Equal Employment Opportunity Commission. (ER-83). They had been, or still were, employed in a very large facility, i.e., a warehouse of approximately 700,000 square feet. (*Id*. at ER-84). About half of the several hundred employees were men, and half, women. (*Id.*) In about five different locations, S & S allowed its employees to place large, commercial-grade speakers. Employees routinely streamed music from their smartphones, which was broadcast via the speakers. (*Id.*) The music could be easily heard over the background noise of the warehouse. (*Id.* at ER-84 & ER-90-91.) The music was played routinely for a couple of years, i.e., from near the time the warehouse opened until late winter or spring of 2020 – at which time S & S became aware litigation was imminent, and finally curtailed the behavior. (*Id.* at ER-84.)

Appellants allege the music was offensive because of its sexually abusive and misogynistic content. (*Id*.) Appellants allege some male employees were offended.

> Further, a number of men who were employed were offended by the music and related conduct "because of sex". And, as with plaintiff Anthony Baker, a number of men were offended both by the music and related conduct – and by their inability to protect their female co-workers therefrom. That is, they were offended "because of sex" as defined by Title VII of the 1964 Civil Rights Act.

> *Id.*

The "rap" or "hiphop" music of which appellants complained is often incredibly foul. That music served as a catalyst for related, abusive conduct, e.g.,

gestures which pantomimed sexual intercourse and remarks such as "I would hit that", yelled obscenities, etc. (ER-91-92). Gender-specific terms are used in the lyrics of much of the music, e.g., "bi__h", "c__t", "hos" – slang for "whores", etc. Songs such as "Stan" depict extreme violence directed at women (a pregnant girlfriend is stuffed into a trunk and the vehicle is driven into water). (*Id.* at ER-91).

S & S received a number of complaints from employees, mostly women, regarding the sexually offensive and misogynistic content of the music, but nonetheless allowed employees to use "Bluetooth" speakers to continue to broadcast the music. (*Id.* at ER-92. S & S sometimes responded to the complaints by noting the music motivated employees to work harder. (*Id.*)

On December 27, 2021, the District Court entered an Order which granted in part S & S' s Motion to Dismiss. The Court wrote: "Plaintiffs' sexual harassment claim with respect to the music played in the warehouse is dismissed with prejudice and without leave to amend." (Order, p.10, lines 4-6); (ER-22). This ruling is the basis for this appeal.

The Court adopted S & S's argument to the effect because both men and women were offended by sexually explicit, offensive music, "no individual or group was subjected to harassment because of their sex or gender." The Court specifically agreed. (*Id.*, at p.5, lines 18-21); (ER-17). The Court characterized the critical issue as "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." (*Id.* at lines 25-27); (ER-17). The Court's analysis reads in part:

Plaintiffs argue that the music played was offensive to both male and female employees. The eight Plaintiffs bringing this action are seven

women and one man, all asserting that the music was subjectively offensive to them and that it was severe enough to constitute a hostile work environment. But Plaintiffs fail to state an actionable Title VII claim because they fail to allege that the offending conduct was discriminatory. The music was played warehouse wide and all employees were subjected to it. Nowhere in the FAC do Plaintiffs assert that any employee or group of employees were targeted, or that one individual or group was subjected to treatment that another group was not. While the music may indeed have been offensive, sexually explicit, and inappropriate for a work environment, the FAC alleges that it was not directed at employees of either sex. Because "Title VII does not prohibit all verbal or physical harassment in the workplace" but rather is directed at '*discriminat[ion]* . . . because of sex," Plaintiffs' claim fails to allege a Title VII violation. *See Oncale*, 523 U.S. at 80.

Because Plaintiffs do not assert that they were discriminated against on the basis of sex, the Court will dismiss the sexual harassment claim. As Plaintiffs have repeatedly alleged that both men and women were offended by the music, the Court further finds that no amendment could cure the claim and will therefore dismiss with prejudice. However, as explained below in Part D, the Court will grant Plaintiffs leave to amend their sexual harassment claim as it relates to other alleged offending conduct.

Order, p.6, lines 5-23; (ER-18).

**Argument: EXTREMELY OFFENSIVE SEXUAL CONDUCT, WHICH SO EGREGIOUS AS TO OFFEND BOTH GENDERS, IS POTENTIALLY ACTIONABLE PER TITLE VII, REGARDLESS OF WHETHER A MAN OR A WOMAN SUES. THE EFFECT OF SEXUALLY HARASSING CONDUCT ON WOMEN IS ALMOST ALWAYS DIFFERENT THAN THE EFFECT ON MEN.**

A good place to start with this apparently simple analysis (it really is not simple at all) is near the beginning, i.e., with *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L.Ed.2d 49 (1986). The Court discussed the two types

of sexual harassment claims – one of which requires intent and the other, a hostile work environment cause of action, which does not. (106 S. Ct. at 2403). In this case the District Court appears, to a certain extent, to have conflated the two types, and implicitly imposed an intent requirement where none exists. The *Meritor* Court observed the phrase "terms, conditions, or privileges of employment" "evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment." (*Id.* at 2404, *quoting Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, n.13 (1978), and in turn *quoting Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971). The *Meritor* Court went on to quote *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).

> [T]he phrase 'terms, conditions or privileges of employment' in [Title VII] **is an expansive concept** which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination . . .   One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority workers . . . .

[Emphasis added.]

In *Meritor* the Court dealt with a situation in which a female subordinate had engaged in sex with her male superior on 40 or 50 occasions, over a period of about four years. The Court refused to focus on whether the sex acts were voluntary, but instead on what preceded those acts. "The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." (*Id.* at 2406).  Basically, the Court held unwelcomeness cannot be cured by acquiescence. There is an analogy to the S & S fact pattern. The District Court basically held the effect of unwelcome

and sexually graphic rap music on women may be cured, or negated, by the fact some men were also offended. And, of course, in this fact pattern there is not even an element of acquiescence (Ms. Vinson was not raped, but rather went to motel rooms under her own power, sans immediate physical coercion).

The *Meritor* Court analyzed the EEOC Guidelines and noted sexual misconduct is prohibited where "such conduct has the purpose **_or effect_** of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (*Id.* at 2404-05); [emphasis added]. The District Court's approach is in error. The District Court focused on S & S's intent, and then went even further. The District Court negated the effect of the routine and very loud obscene music by focusing on the fact some men were offended, including one plaintiff – in addition to the seven female plaintiffs. The Court, in effect, created a carte blanche license to breach Title VII based on the proposition if everyone is offended, no one is offended. The Court did so without any inquiry into how women were affected/offended versus how men were affected/offended. The Order is an unworkable analysis and would allow Title VII to be flouted with ease and in a downright malicious manner. For instance, according to the District Court's analysis women in a typing pool are subject to being disrobed by a male boss and spanked. There is no Title VII liability – so long as the offending manager cleverly takes the precaution of spanking one male employee. It is a short walk from playing music so sexually graphic as to offend all or most women employees and some of the men – to allowing women in a workplace to be spanked under the guise of discipline, so long as a few men are subjected to the same, sexually abusive behavior. It is, of course, an absurd result, but necessarily follows from the District Court's reasoning. The District Court's analysis need be extended only a short distance to arrive at such a disjointed and afflictive result. The District Court's analysis effectively provides a mechanism to evade application of a remedial

statute, based on a false assumption, i.e., there is no significant difference in how men and women perceive gender relations, sex and/or sexually aggressive behavior — therefore if both are offended there is no discrimination.

To be actionable, a work environment must be objectively and subjectively abusive. ". . . the objective portion of the claim is evaluated from the reasonable woman's perspective." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2001).

In *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004), the Court rejected the sort of analysis posited by this District Court.

> Secondly, our case law is clear that the fact that an individual "consistently abused men and women alike" provides no defense to an accusation of sexual harassment. *Steiner*, 25 F.3d at 1463; *see also id.* at 1464. DeLeon's use of racially charged words to goad both black and white employees makes his conduct more outrageous, not less so; as in *Steiner*, were the conduct sufficiently severe or pervasive it might indeed raise the possibility that Ketchum himself could raise a claim of discrimination.

> *Steiner*, a 1994 case, further repudiates the District Court's analysis.

> Furthermore, even if Trenkle used sexual epithets equal in intensity and in an equally degrading manner against male employees, **_he cannot thereby "cure" his conduct toward women._** *Ellison* unequivocally directs us to consider what is offensive and hostile to a reasonable *woman* (emphasis in original). *Ellison*, 924 F.2d at 878 ("conduct that many men consider unobjectionable may offend many women"). And finally, although words from a man to a man are differently received than words from a man to a woman, we do not rule out the possibility that *both* (emphasis in original) men and women working at Showboat have viable claims against Trenkle for sexual harassment.

(*Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463-64 (9th Cir. 1994);

[darkened, slanted, and underlined emphasis added.]

The District Court apparently focused on one point of law and expanded that point to an illogical extent. The expansion is so extreme it threatens to swallow the entire statute and will, in fact, do so given the right circumstances. The language the District Court relied on is from *Oncale v. Sundowner Offshore Services, Inc.*, 532 U.S. 75, 118 S. Ct. 998, 140 L.Ed.2d 201 (1998), i.e., it is a quote from Justice Ginsburg's concurring Opinion in *Harris*. It reads:

> "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. See 42 U.S.C. sec. 2000e-2(a)(1) (declaring that it is unlawful to discriminate with respect to, inter alia, "terms" or "conditions" of employment).

> 118 S. Ct. at 1002.

The District Court's analysis ignores a fundamental point. When a work environment is sexualized, that men and women will be affected differently is inevitable. The disparate treatment which the District Court claims is lacking – because both genders are subjected to the same conduct – is in fact, already present by virtue of the different perspectives men and women bring to the working environment. That is, per their different perspectives, they experience the same conduct in different, i.e., disparate, ways. Further, as noted, disparate treatment may be found, at least regarding the rap music genre, by varied lyrics, i.e., some lyrics, and gender-specific pejorative names are by their nature offensive, or more offensive to women.

A close reading of the Code of Federal Regulations discloses the invalidity of

the Order's simplistic and monolithic approach.  29 C.F.R. sec. 1604.11(a) reads:

> **(a)** Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose **or effect** of unreasonably interfering with an **individual's** work performance or creating an intimidating, hostile, or offensive work environment.

> [Emphasis added.]

Accordingly, the question is what effect did obscene and misogynistic rap music have on the *individual* plaintiffs, i.e., on the *women* and *man* who comprise the eight plaintiffs? That inquiry involves, of necessity, examining the subjective perceptions of the seven women and one man. (The conduct must be objectively and subjectively offensive to be actionable). An overly simplistic way of looking at the situation would entail concluding because both and women were subjected to the same music Title VII has not been violated, i.e., there is no discrimination. The accurate analysis entails looking at the particular language, including gender-specific pejorative name-calling, in conjunction with considering the different ways in which men and women view sexual aggression, misogynistic language and scenarios, and graphic auditory displays of sexuality. Once that is done it is easy to conclude the same music affected men and women differently. Then, the usual questions arise, e.g., how offensive was the music, how often was it played, did the employer know of the music, etc.

Men and women are almost always offended in different ways by sexually

explicit displays in the workplace. *The First Amended Complaint alleges this dispositive fact a number of times.* That is the FAC alleges the seven women plaintiffs were offended by pejorative gender terms, specific to women, e.g., the term "bitch". The FAC alleges the women were offended by the violent misogyny in the songs. Misogyny is, by definition, directed at women, and obviously, it tends to be more offensive to women. Mr. Baker alleges he was offended by the way men were portrayed, i.e., as sexually predatory, and by his inability to protect women. In short, the FAC alleges the female plaintiffs, and the lone male plaintiff were offended in different ways. The fact lyrics which offend both genders may comprise one song does not obviate a central point – men and women are almost always offended in different ways – because of different gender-based perspectives, and often based on different lyrics found within a particular song. Therefore, even per Justice Ginsburg's concurring Opinion, "members of one sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." The second argument herein addresses this point at length.

Even if a hypothetical situation is posited in which men and women are offended by the same sexually explicit display, (auditory or visual), Justice Ginsburg's analysis, and the statute itself, should not be adhered to in a rote manner which winds up negating the entire statutory matrix. Title VII, as this Court has repeatedly observed (*see, e.g., Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991)) is a remedial statutory scheme. It is intended to prevent employees from being abused "because of sex". True, it is also intended to prevent disparate treatment based on gender. That it may be possible to conjure a scenario in which *all* employees are abused in the same way, and to the same effect "because of sex", and therefore disparate treatment is not involved, is hardly a reason to allow wholesale, intense sexual abuse. That result would be completely inconsistent with the very reason for the existence of the statute.

If such a hypothetical display succeeds in rendering a workplace hostile "because of sex" it should be actionable. Men and women will always regard gender relationships, the act of sex, and myriad forms of sexual aggression from different vantage points, and with good reason. Men and women will always be affected differently by sexual harassment. Men cannot get pregnant. Men can father children and not even know they did so. The only way women are able to pass on their genes is through pregnancy, childbirth, and ensuring their children survive. Men have the option (Genghis Khan being the most successful known example) of fathering hundreds or even thousands of children, and not worrying about the survival of a particular child. If they father enough children, they will be very successful in passing on their genes, regardless of the deaths of many infants and children. Men's lives are not endangered by childbirth. Men are only very rarely raped by women and if they are, are not at risk of an unwanted pregnancy. Men are usually bigger and more heavily muscled than women, i.e., they usually have a marked physical advantage in any violent confrontation – including rape attempts. Hence, women are routinely reduced to evaluating risks when they wind up being alone with a man or men. The anthropologist, Margaret Mead, summed up much of the difference when she noted, "[m]otherhood is a biological fact; fatherhood is a social invention." Even the brain waves of men and women during the act of sex are markedly dissimilar. *See, e.g., TWO MINDS: The cognitive differences between men and women*, by Bruce Goldman, Published in Stanford Medicine, Spring 2017. And, of course, the perceptions of men and women are also shaped by very different hormones. In short, it is just about impossible to imagine an auditory or visual display involving sex which would affect women and men in exactly the same manner. Yet, the District Court appears to have assumed this is what occurred – notwithstanding the allegations of the First Amended Complaint to the contrary.

Another way of stating the analysis would be to say Justice Ginsburg's

statement is superfluous. The terms and conditions of a woman's employment, given the biological, physical, and psychological differences between men and women, will *always* be affected differently than those of a man by particular sexual conduct in the workplace.

This Court has discussed the different manner in which men and women view sexual conduct in the workplace.

> For example, because women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual behavior. Women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to a violent sexual assault. Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.

*Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991).

Obscene rap music lends itself to very different experiences for men and women. As alleged in the FAC, that music often contains pejorative gender-specific terms, directed at women. Violence directed at women is often referred to – including violence which involves rape. Graphic descriptions of sex acts are sometimes present. Graphic depictions of sexuality tend to place women in a no-win situation. If a woman is perceived as willingly acceding to listening to such songs she may be seen as sexually wanton, and available – and thereby heighten the chance of becoming a victim of sexually driven violence. And, of course, she will be subject to negative sexual stereotyping. So, even if a woman enjoys the rap genre, it may be dangerous for her to exhibit that enjoyment. Further, the sort of sexual stereotyping which attends welcoming obscene music may be harmful to career advancement.

And, of course, if a woman does not like rap music, she is reduced to dealing with being constantly offended "because of sex". The Order takes none of these realities or considerations into account. Implicit in the Order is the assumption men and women were affected by rap music in identical ways. That assumption is belied by common sense and is, in fact, contradicted by the express and unequivocal allegations of the First Amended Complaint.

**Argument: THE DISTRICT COURT DID NOT FACTOR THE DIFFERENT MANNER IN WHICH MEN AND WOMEN WERE OFFENDED BY DIFFERENT LYRICS, *AS ALLEGED BY THE FIRST AMENDED COMPLAINT*. THE DISTRICT COURT DID NOT ACCORD ADEQUATE WEIGHT TO THE PERSPECTIVES INDIVIDUAL PLAINTIFFS.**

The District Court ignored language in the First Amended Complaint (FAC) which indicated men and women were offended in different ways. The FAC alleged the music was particularly offensive to women because of its degrading content.

Many of those co-employees, especially women, expressed their feelings and perceptions – to the effect the music was offensive and degrading to women.

FAC, p.2, lines 17-19; (ER-84).

The FAC specifically alleges the music was offensive to women because of its misogynistic content.

Accordingly, there is a pool of potential *women* plaintiffs which probably totals in excess of at least 200 persons, i.e., a pool of *female* potential plaintiffs who were probably offended by the *misogynistic* and sexually abusive music and related conduct.

> FAC, p.2, lines 20-23; (ER-84). [Emphasis added].

Conversely, the FAC alleges men were offended in a somewhat different manner.

> Further, a number of men who were employed were offended by the music and related conduct "because of sex". And, as with plaintiff Anthony Baker, a number of men were offended both by the music and related conduct – *and by their inability to protect their female co-workers therefrom.* That is, they were offended "because of sex" as defined by Title VII of the 1964 Civil Rights Act.

> *Id.*, at lines 23-27; (ER-84). [Emphasis added].

The FAC describes ***how the offensive music served as a catalyst*** for offensive conduct, alleged to have been perpetrated by male employees and directed at female employees.

> This implicit repudiation of a reasonable sexual harassment policy resulted in a *myriad form of sexually offensive conduct and statements.* For instance, **male** *employees* openly shared pornographic videos, using their cellular telephones. **Male** *employees*, including some supervisors openly made sexual hand gestures, or movements with their bodies, e.g., pantomiming sexual intercourse. **Male** *employees* were treated in a preferential manner relative to **female** *employees*. Sexual remarks such as "I would hit that", were openly made by various **male** *employees*. **Male** *employees* were allowed to yell obscenities and to subject **female** *employees*, especially those who complained of sexual harassment, to various forms of retaliatory hostility. Inappropriate remarks and inquiries were made by various male employees regarding the sexual orientation of at least one of the plaintiffs.

> *Id.*, at p.9, lines 11-21; (ER-91). [Emphasis added].

The FAC describes how some of the content targeted women.

> For instance, *women* were routinely referred to as "hos" (slang for "whore"), bitches and "c___ts". Songs such as "Stand' [sic "Stan"] by Eminem, were loudly played. That particular song touts the act of forcibly placing a *pregnant woman* in the trunk of a vehicle and then driving the vehicle into a river or other body of water, for the purpose of drowning her.

> FAC, p.10, lines 6-11; (ER-92). [Emphasis added].

That the content was often misogynistic is specifically and repeatedly alleged, as is the fact women were particularly offended by the misogyny. Further, that men were offended by the manner in which the rap genre often portrayed *them* is specifically alleged.

> In short, in addition to repeatedly and forcefully repudiating the written policy which defendant purportedly maintained, and which it promised it would enforce, the act, or omission, of allowing *violently misogynistic* and graphically sexual abusive material to be loudly and regularly broadcast throughout its facility actively [and] successfully encouraged other acts and statements of a sexually abusive and/or *misogynistic character*. By allowing obscene rap music to be routinely and frequently broadcast, defendant S & S Activewear guaranteed its work environment would be offensive "because of sex", ***especially re the average hypothetical woman, and relative to most of its women employees***. *And a number of men were offended by the **manner in which the music portrayed men, and their relationship with women – as well as by the fact they could not protect women from being openly abused on a daily basis.*** were [11] offended by the music and by various sexually-based statements and actions of their co-employees, often performed in sync with or in conjunction with the music.

*Id.*, at p.10-11; (ER-92-93). [Emphasis added].

A fundamental flaw with the District Court's analysis is that the music is portrayed in a one-dimensional or monolithic manner. Yes, the graphic sexual character of the music certainly had the potential to offend both men and women, and yes, Mr. Baker alleges he was offended thereby, as do the women plaintiffs. That being noted, that the women were offended because they were the subject of pejorative gender-specific name-calling is specifically alleged. So too, that the women were offended because of the music's misogynistic content, i.e., hostility directed at women, is likewise alleged. And, that a number of men (including, obviously, Mr. Baker) were offended by the manner in which male relationships with women were depicted is specifically alleged. The District Court's analysis founders on the simple fact particular content is alleged to have offended members of each gender in different ways. The District Court's analysis fails because it is obvious that egregious, graphically sexual content is susceptible of giving offense to both genders simultaneously, albeit differently – and the FAC alleges that is what happened. It fails even more clearly when the manner in which members of each gender were offended is specifically linked to particular content.

In *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991), the Court outlined the controlling analysis.

> Next, we believe that in evaluating the severity and pervasiveness of sexual harassment, we should focus on the perspective of the victim. *King*, 898 F.2d at 537; EEOC Compliance Manual (CCH) sec. 615, 3112, C at 3242 (1988) (courts "should consider the victim's perspective and not stereotyped notions of acceptable behavior."). If we only examined whether a reasonable person would engage in allegedly harassing conduct, we would run the risk of reinforcing the prevailing level of discrimination. Harassers could continue to harass merely

because a particular discriminatory practice was common, and victims of harassment would have no remedy.

We therefore prefer to analyze harassment *from the victim's perspective. A complete understanding of the victim's view requires, among other things,* **an analysis of the different perspectives of men and women**. [Emphasis added.]

The Order turns *Ellison* on its head, and thereby renders Title VII meaningless in the situations in which it should be most effective, i.e., the most egregious situations, which in turn usually elicit the strongest perceptions and feelings. Whereas here, the offensive conduct offends men and women in different ways and *is alleged to have done so* -- that circumstance and allegation must be ignored for the Order to withstand scrutiny. This case is not about an employment practice, e.g., enforcing a requirement that both men and women must have at least 20/20 vision. This is a *sexual harassment* case, which requires particular conduct to be viewed from the perspective of each complainant – whether that complainant be a man or a woman. A vision requirement will exclude men and women from a particular job, based on acuity. A prohibition against sexually graphic music is not subject to being negated because both men and women are offended in different ways.

It matters not if both men and women are offended for two reasons. If men and women are offended based on the same language, i.e., each gender is offended when the language is viewed from the perspective of a reasonable member of that gender, the proverbial slate is not somehow wiped clean by a conceptual sleight-of-hand. The salient and dispositive fact is that a reasonable woman could easily be offended "because of sex", as could a reasonable man, given the reasonable perspective of a person of each gender. (This observation applies more to the first argument, but it is difficult to discuss the wide-ranging scope of *Ellison* without

straying). Given the varied content of rap music, there is usually ample material in a particular song which has the potential of offending women in some ways and men in others – *as alleged in the First Amended Complaint*. For instance, the women took offense at the use of gender-pejorative terms, as well as the violent misogynistic scenarios. Men, such as appellant Anthony Baker, took offense at being portrayed as callous sexual predators/abusers.

In *McGinest*, the Court discussed the potential impact of code words such as "bitch" and "cunt".

> "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment that the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) [citations and internal quotation marks omitted].

> 360 F.3d at 1116.

Mr. Baker took offense at the predatory and ugly manner men were depicted and was upset at his inability to protect his female co-workers.

*Steiner v. Showboat Operating Company*, 25 F.3d 1459 (9th Cir. 1994), cited and quoted above, is directly on point.

> The district court erred in endorsing Showboat's argument that Trenkle's conduct was not sexual harassment because he consistently abused men and women alike. In the first place, that argument mischaracterizes his actual behavior. The numerous depositions of Showboat employees reveal that Trenkle was indeed abusive to men, but that his abuse of women was different. It relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct. *See Harris*, 114 S. Ct. at 369 (defendant called plaintiff a "dumb ass woman," said "you're a woman, what do you know," suggested

"negotiating" her raise at the local Holiday Inn, and "jokingly" asked whether she had had sex with clients). While Trenkle may have referred to men as "assholes," he referred to women as "dumb fucking broads" and "fucking cunts," and when angry at Steiner, suggested that she have sex with customers. And while his abuse of men in no way related to their gender, his abuse of female employees, especially Steiner, centered on the fact that they were females. It is one thing to call a woman "worthless," and another to call her a "worthless broad."

25 F.3d 1463-64.

In *Bell v. Clackamas County*, 341 F.3d 858, 866 (9th Cir. 2003), the Court accorded considerable weight to the perceptions of a plaintiff and noted that to ignore the plaintiff's testimony as to the plaintiff's impressions was to invade the province of the jury. Yet, this District Court appears to have gone far beyond. The Court ignored the language of the First Amendment Complaint – to the effect men and women were offended by the same music in different ways. Instead, the Court focused exclusively on the fact the same music was implicated and apparently jumped to the conclusion men and women were offended in an identical manner. Focusing on the "same" music is, of course an over-simplification. Each song contains a variety of lyrical compositions or statements, and a song may offend men in one way and women in another. Discovery re this point was not had. A dismissal per FRCP 12 is before the Court and, as usual, a Rule 12 dismissal occurred at an early stage.

The District Court focused on an observation made in a concurring opinion, i.e., a succinct observation, obviously made sans any sort of meaningful analysis as to a situation such as the one at bar. This observation was used to justify wholesale, systemic and very abusive sexual harassment, i.e., to eviscerate Title VII, *while ignoring the holding of Oncale*.

> We have held that this [Title VII] not only covers "terms" and "conditions" in the narrow contractual sense, but "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." Meritor Savings Bank, FSB v. Vinson 477 U.S. 57, 64, 106 S. Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). [citations and internal quotation marks omitted].

*Oncale v. Sundowner Offshore Services, Inc.*, 532 U.S. 75, 118 S. Ct. 998, 1001, 140 L.Ed.2d 201 (1998).

In order to address how the terms and conditions of a woman's work environment are affected by a particular conduct, that conduct must be evaluated from the perspective of a woman. (*See Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991)). Conversely, if conduct is offensive "because of sex" to a man, the conduct should be evaluated from his perspective, i.e., the perspective of a reasonable man. Failing to consider what are, always, the very different perspectives and views of men and women toward sexualized conduct in the workplace and then spring-boarding off of that failure so as to conclude there is no disparate treatment and hence no sexual harassment is Kafkaesque. The product is an absurd result, i.e., songs which involve death per swallowing semen in the windpipe, or sex with a murdered female corpse, may be blasted out in a workplace, incessantly, and no Title VII violation will occur. Title VII simply ceases to exist via a too clever by half intellectual sleight of hand. Congressional intent is thwarted.

The District Court, in a 2021 case, implicitly contradicted the analysis used in the case at bar.

"The work environment must be both subjectively and objectively perceived as abusive." *Campbell v. Haw. Dep't of Ed.*, 892 F.3d 1005, 1017 (9th Cir. 2018). While courts must assess whether a reasonable

23

person in the plaintiff's position would consider the workplace to be hostile, "complete understanding of the victim's view requires, among other things, an analysis of the different perspectives" members or different groups might face. *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991); *see also McGinest*, 360 F.3d at 1115-16 (finding the reasoning from *Ellison* likewise applies beyond just sex discrimination but also to other contexts where one group may reasonably have different perceptions of hostility).

*Parento v. Washoe County*, (Case no. 3:19-cv-00303-MMD-WGC) (D. Nev. Feb. 18, 2021), Slip Opinion, pp.6-7.

That the different perspectives of men and women were at play in this case is obvious. Only one man came forward to sue, Mr. Baker – who was offended because of the way men were portrayed as sexual predators, and because he was unable to protect the women with whom he worked. There is no allegation women used the songs so as to harass other employees, e.g., they sang along or pantomimed sex acts in response to hearing the music. It was women who were most often the complainants. It was women who complained of the gender-specific pejorative terms.

The Order does not provide an adequate discussion of how rap music may have been perceived differently by men and women. Because one man sued, for different reasons and from a different perspective, Title VII's remedial purpose is, apparently, to be ignored. A one-dimensional approach, which ignores facts clearly stated in a complaint, and which arrives at a result inimical to the remedial purposes of Title VII, was used. Per that analysis, offensive sexual material may be disseminated in workplaces across the country – so long as the material is really, really bad and offends everyone. Fundamental and permanent differences between the genders are to be ignored in the context of applying a statutory scheme, which by its very design and nature, is intended to respect those differences and thereby

allow men and women to work together in peace.

In *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 114 S. Ct. 367, 371, 126 L.Ed.2d 295 (1993), the Court discussed how a victim's psychological view is relevant.

> But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.*

[Emphasis added.]

In *Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1506 (M.D. Fla. 1991), the Court wrote:

> The sexualization of the workplace imposes burden on women that are not borne by men. 4 T.T. at 199. Women must constantly monitor their behavior to determine whether they are eliciting sexual attention. They must conform their behavior to the existence of the sexual stereotyping either by becoming sexy and responsive to the men who flirt with them or becoming rigid, standoffish, and distant so as to make it clear that they are not interested in the status of sex object.

Regaling women with obscene and/or misogynistic rap songs places them in an impossible position – both re the songs themselves and with the harassing conduct which inevitably accompanies such songs. There is an implicit message which attends allowing "Blowjob Betty" to be blasted out in the workplace, i.e., the written anti-sexual harassment policy means nothing. Just about anything goes and it is open season on the women. The *Robinson* Court nailed the analysis. Women are much

more vulnerable to workplace sexual violence and are more easily subject to sexual stereotyping. They view relationships, sex itself, sexual statements and sexual conduct (especially aggressive sexual conduct) differently than men. The First Amended Complaint alleges some of the specific manners in which the women plaintiffs/appellants were offended. The District Court ignored the content of the FAC and issued an Order which reads as if the men and women in S & S's workplace were offended in an identical manner.

The analysis deepens when the basic, well-known differences between men and women are factored. In *Bostock v. Clayton County, Georgia*, 590 U.S. ___, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020), the Supreme Court wrote:

> To "discriminate against" a person, then, would seem to mean treating that individual worse than others who are similarly situated. *See Burlington N. & S.. F. R. Co. v. White*, 548 U.S. 53, 59 (2006). In so-called "disparate treatment" cases like today's, this Court has also held that the difference in treatment based on sex must be intentional. *See, e.g., Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988). So, taken together, an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex–discriminates against that person in violation of Title VII.
>
> Advance Opinion, p.7.

This is not a disparate impact case, but if it were the well-known differences between men and women re how sexual aggression and sexually offensive conduct are viewed and responded to would favor appellants – especially since a number of the appellants complained of the music, ***and*** of the conduct which the music encouraged. S & S knew a number of the individual women were in fact, offended by the music and related conduct. That is, it knew the individuals who complained were responding in a manner typical of most women. And it knew only one man

complained. Even if a disparate impact analysis is grafted on to this sexually hostile work environment cause of action analysis, appellants would nonetheless have a strong argument.

**Argument: THE DISTRICT COURT'S ANALYSIS IS WRONG, AT A BASIC AND FUNDAMENTAL LEVEL. IF LEGITIMIZED, IT WOULD PROVIDE A WAY TO BYPASS TITLE VII, AND THEREBY FRUSTRATE CONGRESSIONAL INTENT, AND CAUSE AN ABSURD RESULT.**

The ill effects of the Order are manifest in the four corners of the document itself. The Court proposes the complementary conduct (e.g., pantomiming sexual intercourse) catalyzed by obscene, sexually graphic and misogynist music, be litigated – while the music itself is legally ignored. Somehow, in some way which cannot be logically stated, the effect of extraordinarily graphic and offensive sexual music is negated – because it is so sexually gross both men and women were offended! The remedial purpose of Title VII falls by the wayside and employers will be allowed to routinely and frequently regale all of their employees, men and women, with lyrical abominations such as "Blowjob Betty" (or worse, "She" – a girlfriend is murdered and then her corpse is used for sex), sans consequence, based on the rationale: If everyone is offended, no one is. At a visceral level, this Court has repeatedly repudiated this wrong-headed approach.

> By acknowledging and not trivializing the effects of sexual harassment on reasonable women, courts can work towards ensuring that neither men nor women will have to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982).

*Ellison v. Brady*, 924 F.2d 872, 879-80 (9th Cir. 1991).

The *Ellison* Court went on to note ". . . Title VII is not a fault-based tort scheme." *Id.* at 880. The Court wrote:

> "Title VII is aimed at the consequences or effects of an employment practice and not at the . . . motivation" of co-workers or employers. *Rogers*, 454 F.2d at 239; *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S. Ct. 849, 854, 28 L.Ed.2d 158 (1971) (the absence of discriminatory intent does not redeem an otherwise unlawful employment practice).
>
> *Id.*

Nonetheless, an intent requirement is present, in a subtle way, in the District Court's Order.

> Nowhere in the FAC do Plaintiffs assert than any employee or group of employees were targeted, or that one individual or group was subjected to treatment that another group was not. While the music may indeed have been offensive, sexually explicit, and inappropriate for a work environment, the FAC alleges that it was not directed at employees of either sex. Because "Title VII does not prohibit all verbal or physical harassment in the workplace" but rather "is directed at '*discriminat[ion]*. . . because of sex,' Plaintiffs' claim fails to allege a Title VII violation. *See Oncale*. 523 U.S. at 80.

Order, p.6, lines 10-17; (ER-18).

It was not necessary to allege the music was targeted at anyone! As the District Court acknowledges, S & S allowed "offensive, sexually explicit" music to be played in its work environment. The only remaining relevant questions involve inquiry into how frequently and loudly the music was played, how often a particular plaintiff was exposed thereto, and whether that employee was offended – and in what

ways. There is no targeting requirement. "Targeting" by its very nature, implicates intent. Be that as it may, many of the lyrics were offensive to women, based on, for example, gender-specific pejorative terms. S & S knew this via the routine presence of managers, present within easy earshot of a particular speaker. *And, S & S knew, by virtue of repeated complaints, lodged by some of the appellants, that those appellants were offended "because of sex", i.e., because of sexually graphic, obscene and misogynistic music which targeted women and/or was especially offensive to women.* Based on the content of the music, and complaints lodged by particular women employees, S & S knew, and should have known, there were almost certainly many other women who were offended in the same manner, based on the same gender-specific pejorative language/misogynistic lyrical content. The same analysis applies, with somewhat lesser force, to the lone male litigant. ". . ., an employer cannot escape liability by demonstrating that it treats males and females comparably as groups." (*Bostock v. Clayton County, Georgia*, 590 U.S. ___, 140 S. Ct. 1731, 207 L.Ed. 2d 218 (2020), Advance Opinion, pp.14-15.)

It is true that sexual harassment is a form of discrimination. It is also true there is no intent requirement which attends proving a viable cause of action for sexual harassment. As the *Ellison* Court noted, Title VII is aimed at effects or consequences of a behavior. It is easy to broadcast content which is so graphic as to offend both men and women "because of sex". That both men and women are offended does not somehow, in some way which cannot be clearly stated, negate the offensive character of the material. Each person, man or woman, who is offended, is offended "because of sex", based on either a female perspective or a male perspective. Title VII has been violated. One analytically incorrect way one may arrive at a contrary result is to incorrectly graft on a targeting requirement, i.e., an intent to harass one gender. That requirement simply does not exist. It is contrary to established, black-letter law.

The Court's analysis ignores a basic point – *music does not target; it subjects*. No one in the S & S work environment was individually targeted by the obscene music. Each person who came within range of one of the five speakers was subjected to sexually graphic and misogynistic music. Intent, harbored either by the employer, or the persons responsible for playing the music, is not required as a predicate to establishing a viable hostile work environment cause of action.

> But harassing conduct need not be motivated by sexual desire to support
> an inference of discrimination on the basis of sex. A trier of fact might
> reasonably find such discrimination, for example, if a female victim is
> harassed in such sex-specific and derogatory terms by another woman
> as to make it clear that the harasser is motivated by general hostility to
> the presence of women in the workplace.

*Oncale v. Sundowner Offshore Services, Inc.*, 532 U.S. 75, 118 S. Ct. 998, 1001, 140 L.Ed.2d 201 (1998).

It does not matter if S & S permitted the music because it perceived the music as causing some employees to work harder. It is of no consequence that those responsible for streaming the music may have been motivated by the simple fact they like the music, i.e., they did not harbor a desire to offend anyone. (*Equal Employment Opportunity Commission v. National Education Association*, 422 F.3d 840 (9th Cir. 2005)).

The sort of result the Order creates was repudiated by the Court in *Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1526-27 (M.D. Fla. 1991).

> The "social context" argument cannot be squared with Title VII's
> promise to open the workplace to women. When the pre-existing state
> of the work environment receives weight in evaluating hostility to
> women, only those women who are willing to and can accept the level

of abuse inherent in a given workplace-a place that may have historically been all male or historically excluded women intentionally-will apply to and continue to work there. It is absurd to believe that Title VII opened the doors to such places in form and closed them in substance. A pre-existing atmosphere that deters women from entering or continuing in a profession or job is no less destructive and offensive to workplace equality than a sign declaring "Men Only." As the Fifth Circuit recently observed, ***"Work environments 'heavily charged' or 'heavily polluted' with racial or sexual abuse are at the core of the hostile work environment theory."*** *Wyerick*, 887 F.2d at 1275. ***To implement fully the promise of Title VII, "the standards for assessing women's psychological harm due to harassment must begin to reflect women's sensitivity to behavior once condoned as acceptable."*** Note, *The Aftermath of Meritor: A Search for Standards in the Law of Sexual Harassment*, 98 Yale L.J. 1717, 1737-38 (1989).

[Darkened and slanted emphasis added.]

Precisely. The Order turns back the clock by over fifty years. Women may be excluded from just about any workplace by rendering that workplace intolerable to them. Exclusion will occur via the fictive and bogus assumption men and women are the same and are offended in the same way by graphic displays of sexuality, and even misogynistic statements, and even worse, by specific gender-pejorative terms. This atavistic approach is to be justified by erroneously concluding because both men and women are offended in the same manner there is no legal recourse. It is a truly absurd result and flatly inimical to Title VII and Congress' intent.

**Argument: THE COURT'S ANALYSIS IS UNWORKABLE.**

If the very different perspectives of men and women are ignored, Title VII will cease to be susceptible to enforcement in many, and probably most, instances. All an employer/Title VII defendant need do is establish both men and women were

subject to the same sexually offensive, egregious misconduct and at least one man was offended thereby. Title VII liability will not attach, based on the chimerical proposition offense taken by a single member of the male gender precludes application of a remedial statutory matrix, intended to prevent sexual hostility from permeating a work environment. Applying a disparate impact analysis to a hostile work environment cause of action, while ignoring the different manner in which men and women view and/or experience sexually offensive or aggressive behavior is a recipe for eviscerating Title VII. Absurd results will routinely occur. An employer will be at liberty to, for example, install large screen televisions and subject female and male workers to a repertoire of grossly pornographic films. Employers who are inclined toward sexual abuse will actually be encouraged to widen the scope of abuse, i.e., to ensure both men and women are subject to sexual harassment – so as to ensure they are insulated from lawsuits by members of both genders. A bizarre affirmative defense will be created, based on the issue whether members of both genders were offended.

Parsing the intricacies of Title VII law, e.g., the necessity of looking at sexual conduct primarily from a woman's point of view, is interesting. So is a form of reverse engineering. One need only look at the result of the Order to know the reasoning which underlies that Order is very, very flawed. The result is the antithesis of the goal of Title VII, i.e., a workplace substantially free of sexual hostility. Somehow, it will be legally permissible for an employer to permit sexually graphic and violently misogynistic rap music to be blasted out in the presence of over a hundred women – who vehemently object. That result is to be achieved by ignoring the perspective of a reasonable woman, so as to arrive at the false conclusion both men and women are offended in the same way and in comparable measure. Ergo, there is no discrimination! Title VII has been repealed in a de facto manner by an intellectual sleight-of-hand. And, of course, the same rationale may be extended so

as to legitimize just about any form of sexual abuse, e.g., large screen televisions which show pornography; spanking; crude sexual jokes told to everyone (both men and women) at mandatory company meetings, etc. So long as both men and women are offended "because of sex" no one will be able to utilize Title VII.

## **CONCLUSION**

The Order is based upon a false assumption, i.e., that because the appellants complained of music, which was broadcast to both men and women, and because at least one man was offended, in addition to seven women, discrimination is not possible. That assumption bypasses the manner in which potentially sexually offensive conduct must be evaluated, i.e., based on its effect on *individuals*. That is, the different perspectives which men and women bring to the workplace must, as a matter of course, be considered. Even if the First Amended Complaint did not specifically allege some of the different ways in which women and men were offended "because of sex", the commonly known different perspectives of men and women should have prevented dismissal at such an early stage. However, the First Amended Complaint *does* specifically implicate the differing perspectives of women and men, e.g., the female perspective re gender-specific pejorative language and misogyny versus the male perspective re a negative portrayal of masculine/predatory sexuality. It is extremely difficult, if not impossible, to imagine with specificity sexually offensive conduct which will be experienced by men and women in an identical manner. Here, the conduct at issue was not one-dimensional, i.e., many different songs were broadcast, which contain varied lyrics, offensive to men and women in different ways.

The District Court ignored the specific allegations of the First Amended Complaint and concluded, without meaningful analysis, exposure to the genre of rap

music affected men and women in an identical manner and therefore it is impossible discrimination occurred. This conclusion was arrived at in violation of the principles governing adjudication of a FRCP 12 motion and in contravention of specific allegations found in the First Amended Complaint. It is also belied by common sense and is in derogation of a multitude of controlling cases, e.g., *Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991). Appellants request the Order be reversed and this matter remanded for trial.

## STATEMENT OF RELATED CASES

Appellants are unaware of any related cases.

Accordingly, pursuant to Ninth Circuit Rule 28-2.6, Appellants certify they are unaware of any related appeal pending before the Court which arises out of the same District Court case as the present appeal.

Dated this 8th day of June, 2022.

/s/ Sean McDowell                 /s/ Mark Mausert
Sean McDowell                     Mark Mausert
Counsel for Appellants              Counsel for Appellants

## CERTIFICATE OF COMPLIANCE

This brief contains 11,030 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Date: June 8, 2022

LAW OFFICE OF MARK MAUSERT

*/s/ Mark Mausert*
MARK MAUSERT
SEAN McDOWELL

*Attorneys for Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: June 8, 2022

LAW OFFICE OF MARK MAUSERT

*/s/ Mark Mausert*
MARK MAUSERT
SEAN McDOWELL

*Attorneys for Appellants*